**Wilma DiBello GIDDENS, Plaintiff in Error,**

v.

**The STATE of Oklahoma, Defendant in Error.**

**No. A–14475.**

Court of Criminal Appeals of Oklahoma.

Jan. 22, 1969.

Rehearing Denied April 9, 1969.

Second Rehearing Denied May 5, 1969.

Berry & Berry, Oklahoma City, for plaintiff in error.

G. T. Blankenship, Atty. Gen., Bruce G. Rossiter, Legal Intern, for defendant in error.

BUSSEY, Judge.

Wilma DiBello Giddens, hereinafter referred to as defendant, was charged by Information in the District Court of Oklahoma County on April 11, 1966, for the crime of Murder. On January 16, 1967, she was tried by a jury and a verdict of guilty of Manslaughter in the First Degree was returned and her punishment fixed at fifteen years in the State Penitentiary. On February 3, 1967, defendant filed "Motion in Arrest of Judgment," which was overruled and defendant petitioned this Court for "Writ of Mandamus and/or Prohibition." The motion was denied and sentencing of defendant was set for April 25, 1967. A Motion for Suspended Sentence was filed by defendant and, on the date of sentencing, she was permitted to put on evidence in mitigation of punishment. The Motion for Suspended Sentence was denied and the defendant was sentenced to serve fifteen years in the State Penitentiary at McAlester, Oklahoma. An appeal bond was granted, and a timely appeal has been perfected to this Court.

In order to deal with the assignments of error urged on appeal, we deem it necessary to set forth a condensed version of the evidence adduced on the trial.

The first witness called by the State was B. R. Wright, a Police Officer with the Oklahoma City Police Department, who stated that he investigated a shooting on the 8th day of April, 1966, at 2544 S.W. 52nd, Oklahoma City. He pointed out the defendant who was at the scene, who said, "Help me. My husband has been shot." At the time of his arrival Mr. Giddens was being loaded in an ambulance which had been called. Mr. Wright asked her who had shot him and she said, "I did." The officer found the weapon lying in the front yard.

The next witness was Barbara Sams, a Secretary for Universal Guard Service. She had known Mr. Giddens a few months before his death. She was divorced and he was divorced, and during this time they dated. On the 8th day of April, 1966, he called at her home and asked for a cup of coffee. Her children were there. While Mr. Giddens was there, Mrs. Giddens came by around 7:00 and blew the horn of her automobile. Mr. Giddens went out and the defendant was cursing and talking loudly and said something about wanting her key and that she wanted Mr. Giddens to come and get everything out of her house. Both parties left.

The next witness was Mrs. Evelyn Garrison, who testified that she had just retired from working at Sears. She was the sister of the deceased. On the 8th day of April, 1966, she received a telephone call from the defendant between 7:30 and 8:00, and said her voice was "real shrill and she was screaming." During the conversation, she stated that she had Jerry's gun loaded and "I'm going to kill him." She and her husband drove to Wilma and Clifford's house and they were advised by a member of the police department as to what had happened. She stated that the last thing the defendant had said to her over the telephone was, "Here he is now."

Betty Lou DiBello testified that she was the ex-wife of the deceased, and that her present husband, Ignatius DiBello, was the ex-husband of the defendant. On April 8, 1966, the defendant called her about five minutes until 7:00. She wanted to know if Iggy was there, but the witness told her he would not be home until the next night. She said that something had to be done about Jerry. She said that Clifford and Jerry just didn't get along and the witness suggested that Jerry come over there for a few nights. The defendant further stated: "I ought to kill him but I don't guess I can't." [sic] She also stated in the conversation that she was getting ready to go to Lindsey, to her parents, if she could get away before Clifford came back from over at his girlfriend's house. The defendant also stated she had just gotten back from the "girlfriend's" house.

The first defense witness was Jerry Crabbe, Oklahoma County District Court Clerk, who identified the Petition for Divorce and Divorce Decree of Barbara Sams, granted March 25, 1966.

Barbara Sams was recalled as a defense witness and her testimony only related to her divorce from Mr. Sams and the date of this divorce.

The next defense witness was Betty DiBello who was questioned about a letter she was supposed to have given to Mrs. Whickey to the effect that if she were ever found dead the letter was to be given to the County Attorney. She denied this.

Jerry DiBello testified that he was the defendant's son. On April 8, 1966, around 6:00 in the evening, Clifford Giddens came home and fixed a drink. They sat down to dinner and Jerry asked his mother to get him some butter. Clifford said, "Get it yourself. She's busy." An argument then ensued and Jerry stated that the deceased started beating his mother. The defendant started to pack their clothes and Mr. Giddens left the house. Jerry's mother instructed him to get the car and go after gas, which he did. He returned and told his mother that Clifford was in a phone

booth across from the filling station. The defendant commented that he was over at Barbara's and told the children to pack that she had to do something and would be right back. At this time she got a blue bow, put it in her pocket, said she was going over to Barbara's and left the house. She returned in about ten or fifteen minutes and started telephoning. She told the children to get in the car and they did so. Jerry stated that they waited in the car with the suitcases while she was on the phone. About five minutes later Clifford drove in the driveway and got out of the car immediately. The testimony of Jerry DiBello, appearing at page 82 of the case made, best summarizes what happened:

"At this point, all the time they were talking, he was walking towards her and she was backing up, trying to get away from him. He was close enough where he could have grabbed the gun. As he got her in front of the bay window in front of our house, he grabbed towards the gun and it went off. At this point, Mother jumped off of the porch and threw the gun as she jumped and run behind my car. She said, 'Jerry, get out of here.' So I backed up and she said, 'Get to the nearest phone booth.' So we drove to the nearest phone booth and called the police. When we got back in front of the house, the police car had driven up."

Mr. Ray Horn testified that he was a neighbor of the Giddens' and in September, 1965, he observed Mr. Giddens beating the defendant in the yard of their home at about 5:00 in the morning.

The next witness was Wayne Eaton, who worked at the post office and had known the defendant for eight or ten years, and both Mr. and Mrs. Giddens had worked for him. As to the deceased's reputation, he stated that he was very changeable.

The next witness was Owen N. Robinson, an employee of the post office as a supervisor, who was acquainted with the defendant and the deceased. On March 30, 1966, he stated that he had coffee with the deceased, who had told him that he had knocked his wife down and stomped her.

The next witness was S. J. Legg, an employee of the post office, who was acquainted with the defendant and the deceased. He testified that in November, 1965, the defendant had bruises on her arm and her eyes were blacked. The witness testified that in talking to another clerk, he stated that he didn't see why a man would beat a woman like that, and Mr. Giddens came up and stated that she was his wife and he could beat hell out of her any time he wanted to. The witness told him that any man that would beat a woman was a coward and didn't have the guts to pick on a man. Both men jumped to their feet, but Giddens went to the supervisor and took leave and went home.

Debbie DiBello testified that she was ten years old and the daughter of the defendant. She stated that her father was Ignatius DiBello, but that she lived with her mother. Her testimony was essentially the same as her brother's as to what happened the night of April 8, 1966.

Eugene Jones testified that he was employed at the post office and was acquainted with the defendant and the deceased. As supervisor, he had had trouble with Mr. Giddens and had to "write him up" because he was belligerent, indignant, and subordinate. This witness had copies of his reports and they were admitted into evidence, without objection, as exhibits 8 and 9.

The next witness was the defendant. The gist of her testimony was the same as her children. She elaborated on the many beatings she had received at the hands of the deceased. On cross-examination by the District Attorney, she was questioned as to her relationships with the deceased prior to her marriage. She denied having any illicit relationships with him and there were no objections interposed by her attorney.

On rebuttal, Mrs. Evelyn Garrison was questioned by the District Attorney. On

page 214 of the case made, the following appears:

"Q. What was the nature of that conversation? What did you say to her and what did she say to you?

A. She called me back to the ladies room. She had left the table. We had just started eating. She called me back to the ladies room. I went back and she was hemorrhaging. I asked her what was wrong. She said she wanted to go home. We took her to her home. The children were there. This was on Madison, East Madison. She continued to hemorrhage. We contacted the doctor who had done her surgery at Lindsay or Pauls Valley. I believe it was Pauls Valley. He in turn told us which doctor to call here in Oklahoma City. We called Dr. Gerald Rogers.

Q. You can't talk about that. What conversations did you have with Wilma?

A. I asked her how come she was hemorrhaging. She said she had climbed the steps to Clifford's apartment and had intercourse with Clifford when she wasn't well.

Q. Was this prior to the time she and Clifford were married?
A. Yes.

MR. HYDE: I'm going to move that all of this be stricken.

THE COURT: Overruled."

The next witness called was Bob Hutton, a member of the Oklahoma City Police Department, who investigated the shooting and denied any conversation between him and the defendant relative to the fact that a .22 would not hurt anybody. He further testified that he did not observe any marks about the defendant's face.

The next witness was Don Robertson, a detective with the Oklahoma City Police Department, who testified that he talked to the defendant at the police station at 9:40 in the evening of April 8, 1966. He observed no marks or bruises about the face of the defendant. He advised her of her constitutional rights, and she made no mention to him that her husband had beaten her on this occasion. She made a statement which was offered as State's Exhibit No. 11.

The next witness was Officer Wright, who stated that he observed no marks or bruises about the face of the defendant, but she had advised him that she had three broken ribs and how she received these injuries. At the conclusion of this witness' testimony, both sides rested, the instructions were given, and the jury retired to deliberate, finding the defendant guilty, and left the punishment to the judge.

Although the defendant argues several assignments of error on appeal, most of them are based upon the introduction of the testimony of Mrs. Evelyn Garrison as a part of the State's rebuttal, as previously set forth, relating to a statement by the defendant that she had had sexual relations with the deceased prior to their marriage. Although counsel for defense strongly urges this Court that he did not open the door to the admission of this testimony, the record clearly reflects that the first question relating to improper relations occurred on direct examination of the defendant by her attorney, when the following appears at page 161 of the case made:

"Q. After your divorce from Iggy, how long was it before you started seeing Mr. Giddens on more than a social basis?

A. I never saw Mr. Giddens on other than a social basis.

Q. Did you ever have any improper relations with Mr. Giddens prior to the time you married him?

A. No sir."

Counsel now argues that the testimony of Mrs. Garrison was the introduction of evidence of separate and distinct offenses and that the same was either lewdness, or adultery, as defined by the statutes of the

State of Oklahoma, and that its introduction was so fundamentally erroneous as to require reversal.

 It is significant that the testimony now complained of was not objected to at the time the question was propounded, with exceptions taken to the ruling by the court, but counsel moved that the same be stricken after its admission, without objection. Under this situation we could dispose of this alleged assignment of error under the familiar rule often enunciated by this Court, that errors to which no objections are interposed, or exceptions taken, will not be considered on appeal. While we fail to see the competency of such testimony, it is readily apparent that this line of testimony was opened by the defendant and that the alleged act of sexual intercourse with the deceased, after his divorce, and after the defendant's divorce, and prior to their marriage, constituted neither adultery nor lewdness within the contemplation of the statutes of the State of Oklahoma. We are of the opinion, and therefore hold, that the defendant's contention that the admission of this testimony was reversible error, is without merit for the reasons that:

(1) it was invited by the defendant;

(2) it was not objected to with exceptions taken to the ruling of the court at the time the question was asked; and

(3) that such testimony would not inject into the case a separate and distinct offense other than the offense for which the defendant was on trial.

Having determined that this line of questioning was opened by defense counsel in his direct examination, and in view of the fact that no objection was interposed to the question propounded of witness Garrison, we deem it unnecessary to consider whether such question and the answer elicited by it, would have been error, had proper objection been interposed, with exception taken to the ruling of the court.

 The only other proposition substantially argued in the brief of defendant is that the trial court erred in refusing to grant the defendant a suspended sentence. We believe this contention is equally without merit, for it is well established that the granting or denial of a suspended sentence is within the sound discretion of the trial court and his ruling thereon will not be disturbed on appeal unless there is a clear abuse of discretion. The trial court heard testimony of all the witnesses, had an opportunity to observe the defendant, her conduct and demeanor throughout the trial, and while on the witness stand, and was in a better position to determine whether, under the facts and attendant circumstances, the defendant was entitled to a suspended sentence. From an examination of the record we cannot see that the trial court abused his discretion in making this determination.

For all of the reasons above set forth, we are of the opinion that the judgment and sentence appealed from should be, and the same is hereby, affirmed.

BRETT, P. J., and NIX, J., concur.